UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TROY J. QUIBODEAUX, ETAL.** | ***CIVIL NO. 6:11-2172** |
| **VERSUS** | ***MAGISTRATE JUDGE HILL** |
| **CHEVRON USA, INC.** | ***BY CONSENT OF THE PARTIES** |

<u>**MEMORANDUM RULING**</u>

Pending before the Court is a Motion for Summary Judgment filed by Chevron U.S.A. Inc. ("Chevron"). [rec. doc. 26]. Plaintiffs, Troy J. Quibodeaux and Laurie Quibodeaux, (collectively "plaintiffs"), have filed Opposition. [rec. doc. 29]. A hearing on the Motion was held on February 20, 2013. [rec. doc. 28]. Thereafter, Chevron filed a post-hearing Supplemental Memorandum in Support of Summary Judgment. [rec. doc. 39]. Plaintiffs did not file any additional memoranda in opposition to the Motion. For the reasons set forth below, the Motion for Summary Judgment is **DENIED**.

<u>**BACKGROUND**</u>

This suit arises from an accident that occurred on January 9, 2011, on Chevron's platform, VR 245-E. [rec. doc. 1]. Troy J. Quibodeaux ("Quibodeaux") alleges that he hurt his back after he tripped and fell on a hatch located on the deck of the platform. [rec. doc. 1]. CCS Corp. ("CCS") was an independent contractor, whom Chevron retained to perform well flow-back operations on its platform. [*See* Statement of Uncontested Material Facts rec. doc. 26-8, No. 9 and 13 and Plaintiff's Response thereto rec. doc. 29-1,

1

Nos. 9 and 13]. At all relevant times, Quibodeaux was employed by CCS. [*Id.*, rec. doc. 26-8, No. 14; rec. doc. 29-1, No. 14].

About two to three months prior to commencing work, Quibodeaux conducted a "walk-through" inspection of the platform. [Deposition of Quibodeaux, pg. 52-53]. The purpose of this inspection was to determine the type and amount of equipment CCS could bring for the job. [*Id.*]. Quibodeaux stated that while on initial inspection he "may have seen" that hatch covers were present on the platform, but doubted that he had seen the hatch which he tripped over because the deck was crowded with equipment. [*Id.* at pg. 54-55].

Quibodeaux, who was the CCS supervisor on the job, and his crew arrived on VR 245-E on January 8, 2011. [*Id.* at pg. 50]. Upon arrival, Quibodeaux met with Mr. Broussard, who was the Chevron supervisor; after this meeting Quibodeaux conducted a Job Safety Analysis (JSA). [*Id.* at pg. 152-157]. During the JSA, Quibodeaux looked for "slip, trip or fall hazards", but the hatch in question was not identified as such a hazard. [*Id.* at pg. 135-137, 157-165]. While Quibodeaux recalled seeing hatches, he did not inspect them because they looked flush with the deck and appeared "tight and very well fitted" with "no play in them." [*Id.* at pg. 136, 142, 149-150]. Moreover, with respect to the hatch in question, Quibodeaux testified that although he had seen the hatch, it likewise appeared to be flush. [*Id.* at pg. 165, 167, 170, 192].

2

Quibodeaux stated that sometime in the afternoon of January 9, 2011, he and his crew were "cleaning up the hoses" that were not being used, in order to move those hoses out of the walkway. [*Id.* at pg. 158]. While walking backwards, and dragging the hoses that were to be put away, Quibodeaux stated that his heel caught on a hatch causing him to fall and land on his buttocks. [*Id.* at pg. 56-57, 163, 170]. Quibodeaux was unsure whether anyone had seen the accident. [*Id.* at pg. 113]. Following the accident, Quibodeaux continued to work for the rest of the day. [*Id.*]. Quibodeaux did not report the accident to Mr. Broussard until the next day; an action for which Broussard criticized him. [*Id.* at pg. 113-114].

Upon completion of the accident report, Quibodeaux and his crew were flown back to shore due to a delay in the flowback. [*Id.* at pg. 184]. Upon arrival at the heliport, a representative from CCS took Quibodeaux to Stafford Clinic so that a drug test and examination of his injury could be conducted. [*Id.*]. Quibodeaux underwent testing and eventually had spinal surgery, which he has alleged was caused by the accident in question. [rec. doc. 1].

Neither party has submitted evidence when the hatch cover in question was fabricated. However, Chevron's platform supervisor, Luke Broussard, described the typical process employed by Chevron to fabricate hatch covers. Mr. Broussard testified that when hatch covers were needed, they would be constructed on site by a contract construction crew under the guidance and direction of the Chevron facility representative,

3

who was to ensure that the Chevron standards for hatch covers were met. [rec. doc. 29-7, pg. 10-15].  Moreover, typically, Chevron inspected its facilities annually looking for risks, such as trip hazards. [rec. doc. 29-15, pg. 13-15].

## LAW AND ANALYSIS

### I. Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  Rule 56(e) provides, in pertinent part, as follows: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)[2], the court may: . . . (3)grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."

If a defendant's Motion for Summary Judgment is properly made and supported, the plaintiff may not rest upon the allegations in his pleadings, but rather must go beyond

---

[1] Rule 56 was revised, effective December 1, 2010, "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts.  The standard for granting summary judgment remains unchanged." See Committee Notes, Rule 56.

[2] Rule 56(c)(1) provides, in pertinent part, as follows:
A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

the pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54 (1986). However, metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions and those supported by only a scintilla of evidence are insufficient. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Furthermore, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial. *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) *citing Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). Summary judgment is mandated against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

**II. Choice of Law**

The Outer Continental Shelf Land Act ("OCSLA"), 43 U.S.C. §1331, *et. seq.*, states, in part, that federal jurisdiction extends to:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.

43 U.S.C. §1333(a)(1).

The statute continues by stating:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf.

43 U.S.C. § 1333(a)(2).

Louisiana law therefore applies in this case as surrogate federal law. *See e.g.*, *Fruge v. Parker Drilling Co.*, 337 F.3d 558 (5th Cir. 2003); *Coulter v. Texaco, Inc.*, 117 F.3d 909 (5th Cir. 1997); *Gulf Offshore v. Mobil Oil Corporation*, 453 U.S. 473 (1991).

**III.  Liability under Article 2315**

It is undisputed that CCS was an independent contractor of Chevron. [*See* Statement of Uncontested Material Facts rec. doc. 26-8, No. 9 and Plaintiff's Response thereto rec. doc. 29-1, No. 9]. Under Louisiana negligence law, a principal, such as Chevron, is not liable for the actions of its independent contractor, such as CCS, unless the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or the principal retained "operational control" over the contractor's work or expressly or impliedly approved its unsafe work practice that led to an injury. *Fruge*, 337 F.3d at 561; *Coulter*, 117 F.3d at 912.

It is undisputed that CCS' was not performing ultrahazardous activities at the time of Quibodeaux's accident.  [*See* Statement of Uncontested Material Facts rec. doc. 26-8, No. 11 and Plaintiff's Response thereto rec. doc. 29-1, No. 11].

Moreover, Quibodeaux has offered no evidence to contradict the evidence submitted by Chevron demonstrating that it did not retain "operation control" over CCS' work. To the contrary, it is admitted that Chevron did not retain operational control.  [*See* Statement of Uncontested Material Facts rec. doc. 26-8, Nos. 10 and 12 and Plaintiff's Response thereto rec. doc. 29-1, Nos. 10 and 12].  The Master Service contract between Chevron and CCS provides that CCS had control over the subject work, specifically stating that CCS "shall remain an independent contractor" which "shall control and direct the performance of the work." [Chevron Ex. B, ¶ 3.1].  When a contract assigns the independent contractor responsibility for its own activities, the principal does not retain operational control. *Fruge*, 337 F.3d at 564 *citing Coulter*, 117 F.3d at 912.  Finally, Quibodeaux admitted in his deposition that Chevron was not directing or exercising operational control over his work activities. [Deposition of Quibodeaux at pg. 171].

To the extent that Quibodeaux bases his article 2315 negligence claim on Chevron's status as a principal, summary judgment is appropriate because Quibodeaux failed to present evidence to support an essential element of his claim – that CCS' work was ultrahazardous or that Chevron exercised "operational control" over CCS' work.  *Celotex, supra*.

However, Quibodeaux's article 2315 negligence claim rests on another basis which has not been addressed by Chevron in its Motion for Summary Judgment – that Chevron negligently fabricated the hatch cover in the first instance, and then failed to discover the unsafe condition during its annual inspections.[3]  Quibodeaux has presented competent evidence to this Court in support of this claim, citing the deposition of Mr. Broussard and the Rule 30(b)(6) deposition of Chevron, along with a copy of the report of Gregg S. Perkins, P.E. ("Perkins"), plaintiffs' expert, who opines that Chevron and/or its contractors fabricated, installed and approved the hatch cover, and did repair, replace or eliminate the risk posed by the cover prior to Quibodeaux's accident. [*See* rec. doc. 29-2]. This evidence is sufficient for the jury to find negligence on the part of Chevron which could support liability under article 2315.

Perkins further  opines that the hatch cover was not in compliance with Chevron's own safety in design specifications. [*See* rec. doc. 29-2 and 29-3].  While Chevron alleges in its post-hearing brief that these safety in design specifications do not apply to the subject platform, citing the "introduction" section of its manual[4], it has presented this Court with no competent evidence to support this allegation.  The cited portion of the

---

[3] In their Complaint, the plaintiffs' allege "The accident in question was a direct and proximate result of the negligence of Chevron U.S,A., Inc. and its employees in fabricating and deploying a homemade, ill-conceived, and badly engineered solution to installing a proper hatch or lid cover on a hole in the grating on Defendant's production platform." [*See* rec. doc. 1, ¶ V].

[4] The cited "introduction" section allegedly reads as follows:
SID is most effective, and will be used, when building new facilities or modifying and/or upgrading existing facilities.  Existing facilities that are determined to be safe and meet minimum legal requirements are not expected to be modified to meet this 2007 Edition of SID.

8

safety in design manual has not been submitted to this Court, nor has Chevron provided this Court with competent evidence demonstrating the date of the platform's construction or that, as an existing facility, the platform was determined to be safe, meeting minimal legal requirements, and therefore not expected to be modified or upgraded to comply with the standards set forth in the manual.

For these reasons, summary judgment will not be granted on plaintiffs' article 2315 negligence claim.

**IV. Liability under Article 2317.1 and Article 2322**

Plaintiffs also assert a claim under Louisiana Civil Code Articles 2317.1 and 2322. Article 2317.1 states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

Article 2322 states:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he

failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

These articles apply to owners of offshore platforms on the Outer Continental Shelf. *See e.g. Fruge*, 337 F.3d at 565; *Gary v. Chevron USA, Inc.*, 940 F.2d 139, 142 (5th Cir.1991).

Louisiana Courts have set forth four requirements which must be established in order for a plaintiff to recover under these Articles. Under article 2317.1, the plaintiff must establish (1) the defendant's custody or ownership of the defective thing; (2) the defect created an unreasonable risk of harm; (3) the entity's actual or constructive notice of the defect; and (4) causation. *Williams v. Jones*, 34 So. 3d 926, 931 (La. App. 5th Cir. 2010).

Similarly, under article 2322, the plaintiff must show that the defendant was the owner of a building, that the building was in "ruin" on account of a vice in its construction or the neglect of repair, and that the ruinous condition caused the damages sought to be recovered. *Palermo v. Port v. New Orleans*, 951 So.2d 425, 439 (La. App. 4th Cir. 2007). In addition, the plaintiff must show knowledge on the part of the owner. *Joseph v. Crossing II, LLC*, 934 So.2d 875, 878 (La. App. 2nd Cir. 2006). To constitute a "ruin" a building defect must create an "unreasonable risk of harm to others". *Gary*, 940 F.2d at 142 *citing LaDue v. Chevron U.S.A., Inc.*, 920 F.2d 272, 278 (5th Cir. 1991).

Whether a particular risk of harm is reasonable cannot be determined in a vacuum. *LaDue*, 920 F.2d at 277. In general, defendants may have no duty to protect against an

open and obvious hazard. *Ardoin v. Lewisburg Water System*, 963 So.2d 1049, 1051 (La.App. 3rd Cir. 2007); *Hutchinson v. Knights of Columbus*, 866 So.2d 228, 234-235 (La. 2004). If the facts of a particular case show that the complained of condition should be obvious to all, the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. *Id.* The degree to which a potential victim may observe a danger is one factor in the determination of whether the condition is unreasonably dangerous. *Id.* A landowner is not liable for an injury that results from a condition that should have been observed by the individual in the exercise of reasonable care or was as obvious to a visitor as it was to the landowner. *Id.* However, as noted by Quibobeaux, whether a condition is unreasonably dangerous requires consideration of: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature. *Id.*

Chevron argues that the hazard posed by the hatch was "open and obvious" and therefore was not unreasonably dangerous as a matter of law. Chevron asserts that Quibodeaux was aware of the hatch cover, was an experienced supervisor and that he could have avoided the hatch. Chevron further asserts that the hatch "was capable of being positioned so that it was flush with the deck" and that there is no evidence that it was not flush at the time of accident. [rec. doc. 39, pg. 3].

In his opposition memorandum, Quibodeaux argues that the hatch did not meet Chevron's design specifications, because it was not flush or bevelled with the deck. [rec. doc. 29. pg. 9-10]. Quibodeaux additionally argues that while he was aware of the presence of hatch covers on the platform, he had not done a detailed deck-level inspection of this particular hatch, which, from eye level, appeared to be flush with the deck, and therefore, he could not have detected the subtle, non-apparent trip hazard posed by the hatch. Furthermore, Quibodeaux argues that the hatch was, in fact, "askew and sticking up above the grating" at the time of the accident. [*See* rec. doc. 29, pg. 10]. In support, Quibodeaux submits photographs of the hatch taken after the accident. [Quibodeaux Exs. 3 and 4].

Contrary to Chevron's assertion, there is evidence that the hatch was not only capable of being situated in a position not flush with the deck, but also that at the time of the accident the hatch was indeed not flush. The photographs submitted by Quibodeaux show that it is possible for the hatch to be "askew" from the grating. [Quibodeaux Ex. 3]. Further, Quibodeaux testified in his deposition that the hatch "caught my heel" and then "came completely off" when he tripped on it. [Deposition of Qiobodeaux at pg. 56-57, 163, 170]. Moreover, given that Quibodeaux, an experienced offshore worker, testified that he inspected the work area, saw the hatch cover, which the photographs demonstrate appeared flush from eye level, but was unable to identify the hatch cover as a trip hazard, undermines Chevron's argument that the hatch constituted an open and obvious danger.

Finally, Chevron does not produce any evidence to establish that the hatch was, in fact, flush with the grating at the time of the accident. For these reasons, based on the evidence before this Court, at the present time, a genuine issues of material fact exists as to how the hatch was actually situated at the time of Quibodeaux's accident. Accordingly, the Court simply cannot say at this time, with these fact issues unresolved, that Quibodeaux is not entitled to present his case to the trial jury.

In sum, a genuine material issue of fact exists as to how the hatch was actually situated at the time of Quibodeaux's accident, thereby making summary judgment inappropriate. Accordingly, Chevron's Motion for Summary Judgment on plaintiff's claims under Articles 2322 and 2317.1 will be denied.

## **CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment filed by Chevron U.S.A. Inc. [rec. doc. 26] is **DENIED**.

Signed this 3rd day of April, 2013, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE